## Maria, a Freedwoman v. The State.

The court below charged the jury, "In murder in the second degree, the design to kill is conceived and executed in a transport of passion, which renders the mind incapable of cool reflection, and deprives it of the power to weigh well the nature and consequences of the act." This charge, under a certain state of facts, might be unobjectionable; in this case it is *held* to be erroneous, because calculated to mislead the jury, by not properly defining the distinction between murder in the second degree and manslaughter, and because not sufficiently relevant to the cause on trial.

To reduce a homicide from murder to manslaughter, two things must concur: there must have been provocation legally sufficient to produce passion, and there must have been actually produced by the provocation such passion as rendered the party, while under its influence, incapable of cool reflection, depriving her for a time of the power to comprehend the consequences of the act about to be committed. (Penal Code, Art. 594; Paschal's Dig., Art. 2250, Note 670.)

Under the facts of this case the court below should have charged the jury, that the whipping the child of the accused by the deceased was a sufficient legal provocation to reduce the homicide from murder to manslaughter, if, in consequence thereof, the accused was in fact suddenly so enraged as to be incapable of cool reflection, and while so enraged struck the mortal blow of which the deceased died, provided the act of the accused was to be attributed to such sudden passion, and not to a preconceived design. (Penal Code, Art. 599; Paschal's Dig., Art. 2254.)

But it was not error to refuse a charge asked by the accused to the effect, that, "if the defendant did the stabbing under the influence of sudden passion, arising from the deceased beating her child, she would only be guilty of manslaughter." This charge was deficient in not defining the extent and effect of the passion by which the offense might be reduced from murder to manslaughter. It would have authorized the jury to convict the accused of manslaughter only, although in fact the accused might not have been so moved by the passion occasioned by the provocation as to deprive her of the power of coolly forming a design and comprehending the effect of the act she was about committing. (Penal Code, Art. 597; Paschal's Dig., Art. 2252.)

The 599th Article of the Code of Criminal Procedure makes it the duty of the judge to deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case. (Paschal's Dig., Art. 3059, Note 744.) This charge is required to be given in all cases, whether asked or not.

In a case where the homicide may have been murder in the second degree or manslaughter, the court should, without motion, explain to the jury the law of the Code, which will reduce the offense to manslaughter.

APPEAL from McLennan. The case was tried before Hon. THOMAS HARRISON, one of the district judges.

The appellant, a freedwoman, was indicted at the fall term, 1866, of the District Court of McLennan county, for the murder of Mary, who was alleged to have been a slave of B. D. Arnold at the time of the killing, which was laid on the 28th of October, 1863. It was charged in the indictment that the killing was done with a butcher's knife, and that the deceased languished until the 29th of November, 1863, when she died of the wound.

When the homicide in this case occurred, both the slayer and the slain were slaves, residing upon the same plantation, the former being the slave of the mother of B. D. Arnold. As two years elapsed after the killing before any indictment was found, the probability is that the death had been attributed to some other cause, or else it was one of those cases where the master had taken the punishment into his own hands, and was unwilling to incur the additional loss of punishing the murderer by law. At that time slaves were not punished by fine or imprisonment, but only by death or whipping. (Penal Code, Arts. 811, 812; O. & W. Dig., p. 561.) And if a slave were executed for crime, the master was compensated to the extent of one-half his value.

Provisional Governor Hamilton, after the downfall of slavery in 1865, by proclamation, subjected the freedmen to the same mode of trial and punishment as white persons. This was made organic by the VIIIth article of the constitution of 1866, (Paschal's Dig., pp. 943, 944,) and obligatory upon all courts in the United States by the civil rights law of 9th April, 1866. (Paschal's Dig., Art. 5322.)

Yet, as in 1863, when Maria killed Mary, both were slaves, and had Maria then been tried and convicted of manslaughter she would only have been subject to a public whipping by the sheriff, which to a slave was no

disgrace, it would seem to be a question as to whether the law did, by construction, bring her within the punishment of imprisonment in the penitentiary, and whether such a construction would not be an *ex post facto* law, which is forbidden both by the Constitution of the United States and the State. This question was not considered, possibly because the court found no difficulty in reversing the judgment upon the facts, but more probably because in the sudden revolutions which destroyed slavery and the slave code of Texas so important a point was overlooked.

It is now firmly established that slaves are subject to the same passions and punishments and entitled to the same defences as other persons. This case seems to be a precedent that this was the law under the slave code.

The accused was arraigned and plead not guilty, and the trial was proceeded with at the same term, and resulted in a verdict of murder in the second degree, and assessing the punishment at seven years in the penitentiary. The defendant moved for a new trial, on the grounds that the court erred in the charges given and refused, and that the verdict was contrary to the law and the evidence. The court overruled the motion, the defendant appealed, and assigns for error the same causes specified in the motion. In view of the errors assigned and of the opinion of this court, it may be proper to set forth the evidence and instructions.

B. D. Arnold, for the State: Was not at home when the stabbing was done; being sent for, came home and found the deceased in bed, and wounded by a stab under the left breast, in the region of the heart; the deceased told witness she believed she would die from the wound, which impression witness tried, but without effect, to remove from her mind, as she always contended with witness that she would die from the wound. Witness attended on deceased from the evening of the day she was stabbed until she died. She complained of great internal pain

and misery. She told witness that Maria (the defendant) had stabbed her, without cause, with a butcher's knife. She lived about five weeks after the stabbing, and died on the 29th of November, 1863. Before she was stabbed deceased was always healthy, robust, and had no disease. She died at witness' house, in McLennan county, and was the slave of witness before and at the time of her death, and was then about forty years old. The defendant was then the property of witness' mother. Dr. Pierce was called in on the day the wound was inflicted, and left instructions with witness to have cold water constantly applied to the wound, and also medicine for Mary to take, and witness saw that the prescriptions were strictly followed. Eight or ten days before her death the wound healed up externally, and showed no external indications of inflammation. The deceased then complained of more pain internally under the wound. Dr. Pierce visited the deceased three or four times. Witness sent for Dr. F. M. Pitts to examine the wound and render all the medical aid in his power. He came the day before the deceased died, and made a critical and careful examination of the wound. He left medicine for deceased, which was given her by witness. Dr. Pitts said he would come again next day and operate on the wound. The deceased died that night. While confined to her bed she had bloody discharges, but whether they were from the bowels, the vagina, or the womb, the witness did not know.

Angeline, a freedwoman, for the State: Knows Maria, the accused; she inflicted a wound on Mary, the deceased. Mary told Maria that her (Maria's) child had told a lie on her, (Mary,) and asked her to whip the child, and if she (Maria) did not whip her, that she (Mary) would. Maria replied, "I will not do it, and if you do it there will be a fuss, and a big fuss." About half an hour afterwards, deceased found the child in the cook-house, and smacked the child on the bottom with her hand, and, while thus

slapping the child, Maria rushed in and said, "You whip my child, God drast your eyes! I will kill you! I will cut your heart-strings out;" and struck her with the butcher's knife, giving her a wound under the left breast, and attempting to strike her several times more. Mary, in trying to keep the blows off with her hands, was cut several times across the hand and fingers. She struck Maria after the latter had stabbed her, and finally in the scuffle took the knife from Maria and threw it out of the house. The knife was longer than witness' hand; Maria got it from Anderson, a freedman. Mary did not bleed much from the wound, which was given in the cook-house or kitchen of B. D. Arnold, in McLennan county, and State of Texas. Mary, after sitting down a short time, asked witness and others to take her to her cabin to lie down; she was in bed about five weeks, and then died. She never got out of her bed; was sometimes set up in the bed, and sometimes in a chair; grew worse continually until her death; once, when propped up in a rocking-chair, she got up and walked out of the door, but was too weak to return, and was helped back by witness, which was the only time she went out of the house after she was stabbed. Witness waited on the deceased most of the time, and saw blood in her evacuations all the time after a week from the stabbing. On cross-examination, this witness testified to the same purport as the preceding witness with regard to the treatment, medical attention, &c., and said that the deceased was dressed and in her stocking-feet on the single occasion when she went out after she was wounded, and that the day was warm, the wound being cured up externally.

Dr. F. M. Pitts, for the State: Witness is a practicing physician; made one visit to deceased in the latter part of November, 1863, on the evening before she died; found her extremely prostrated, and in a profuse perspiration all the time, seeming to suffer a great deal; saw a scar under her left breast, near the back part of the heart; her ex-

haustion and feeble condition resulted from the wound. Witness was told that she had bloody evacuations; does not think that they were produced from the wound; examined the deceased critically; was then, and still is, satisfied that she died from the effects of the wound.

On cross-examination, Dr. Pitts stated that he examined the deceased only on the one occasion mentioned; examined her carefully, and particularly the wound, but did not open the wound. Had he been called at first to attend on deceased, he would have trusted to cold-water applications alone; too sudden a healing up was not dangerous. Would not have been justified in keeping the wound open; does not know whether it went to the hollow; had it been deep enough, deceased would have died instantly; one wound reaching to the hollow would not necessarily produce death; had this wound been two or three inches deep, it would probably have struck vital organs. Witness could not imagine a wound of this kind which would not be benefited by applications of cold water for five or ten days; there might a state of things arise when cold water would not be a proper application after eight or ten days; the stopping of the cold-water treatment would depend on the symptoms.

On re-examination, the witness stated that after the wound healed up it would not need other applications; there might be internal derangement requiring other applications, such as abscess; if the wound were deepseated, this would have caused hemorrhage of the lungs. Witness believed that Mary's death was the result of the wound.

Anderson, a freedman, for the State: Knows the defendant at the bar; on or about October 25, 1863, she got a butcher's knife from witness, while witness was going to the field to work; it was an old knife, pretty sharp; she got the knife from witness about thirty yards from the house; when she got the knife, she asked witness if he

had any use for her knife; witness gave it to her, and she then went to Fanny's house. The knife was about nine inches long, handle and blade. The witness knew the deceased, and saw her frequently after she was stabbed, but added nothing of importance with regard to her condition.

On cross-examination, Anderson stated that the knife was Maria's; witness had it to cut ox-whips with; Maria sometimes got it to cut up beef with; does not know what she wanted it for on the day in question; witness had been in the field more than an hour before he heard of the fuss at the house.

The State having closed, the defendant introduced Fanny, a freedwoman, who stated that she recollected when the accused cut the deceased. The accused was carding in witness' house on that day. Witness knows nothing of her going to Anderson to get the knife; did not see her with it that day. The accused and witness were both in witness' house when the whipping of the child commenced; witness did not hear the child crying. Directly after Maria went out, witness heard Angeline exclaim, "Aunt Maria has stabbed Mary Chloe." Mary was generally well before this, except a dry, hacking cough, particularly when she caught a fresh cold, but it never disabled her from working. Witness' house is about twenty yards from the cook-house.

On cross-examination, the witness testified that Mary told Maria, "Your child has told a lie on me, and I want you to whip her." Maria said, "I won't hit her a lick, and if you do there will be a fuss, and a big one." This conversation took place about half an hour before the stabbing.

Dr. J. Houston, for the defendant, said he was a practicing physician and surgeon. Cold-water dressing is the best that can be for a fresh wound. It is very important to close up the orifice as soon as possible. Other treatment

may be required for a dangerous wound. Deceased may have died from other causes; may have died from internal disease, or from flux.

On cross-examination, witness stated that if the patient's general health was good, no other applications than cold water would be necessary; that when a wound healed over in eight or ten days no further application would be required; that when a wound healed, and a patient complained under the wound, and the pain increased continually until the patient died, the wound may or may not have caused the death.

On re-examination, he said, that when pain is complained of generally, in connection with bloody discharges, it was as likely to have killed as the wound; that the deceased may have died from disease resulting from the wound.

The whole charge given by the court below of its own motion was as follows:

"The defendant in this case is indicted for murder. The homicide must be proved by the State, that is, the jury must believe from the evidence that Mary, the deceased, died by reason of the wound inflicted on her by Maria, the defendant; and when such fact is satisfactorily established, it becomes immaterial to determine whether the treatment of the wound was skillful or not, or whether by different or further treatment the deceased might possibly have recovered from the wound or not. The defendant is responsible for the death, if it were occasioned by the wound which she inflicted. If, however, the jury should believe from the evidence that the death of the deceased, Mary, was not occasioned by the wound inflicted by Maria, but that the same was the result of disease, or any cause other than said wound, they should acquit the defendant.

"If the jury shall believe from the evidence that the deceased, Mary, died from the wound inflicted by the defendant, it will become their duty to decide upon the grade

of the offense. The defendant may be convicted, under this indictment, of murder in the first degree, or of murder in the second degree, or of manslaughter. Murder is thus defined in the law: "Every person with a sound memory and discretion who shall unlawfully kill any reasonable creature in being within this State, with malice aforethought, either express or implied, shall be deemed guilty of murder." Murder is of two degrees: murder of the first degree, and murder of the second degree. Murder of the first degree is distinguished from murder of the second degree by the presence of express malice. Express malice may be proved by circumstances, as if there be deliberation, cool premeditation, in the commission of the offense; as if one determine beforehand to take the life of another, and do take it; or, as if there be previous preparation for the commission of the offense, as by the procurement of weapons, or the providing of other means for that purpose; or, as if there be previous threats by the accused, seriously made, to take the life of the deceased; and when express malice is thus shown, when there is shown to have been formed in the mind of the accused a determination beforehand, and continuing to and at the time of killing, to take the life of the deceased, the provocation then becomes immaterial, and the length of time during which such state of mind may have existed is also immaterial: it is murder in the first degree. Express malice aforethought may also be shown from the nature of the act itself, as if one, without provocation and with a deadly weapon, kill another.

"Malice is also a necessary ingredient of murder in the second degree, but this is implied malice, not express malice. Implied malice is when one kills another without previous preparation or premeditated design, where there is no deliberate determination to take life; but, on the contrary, where, in the midst of a transport of passion, the intention to kill is formed and executed under circum-

stances not of a character to extenuate the killing to the offense of manslaughter. The jury will perceive that, in both murder of the first and murder of the second degree, there must be an intention to take life; but in murder of the first degree the design is premeditated, deliberate, formed beforehand, and continuing to and at the time of the killing; and, when such is shown to be the state of mind of the accused, the killing would be murder of the first degree, no matter whether the design had existed but for a moment or for a length of time; whilst in murder of the second degree the design to kill is conceived and executed in a transport of passion, which renders the mind incapable of cool reflection, and deprives it of the power to weigh well the nature and consequences of the act about to be committed.

"Manslaughter is where one voluntarily kills another under the immediate influence of sudden passion, arising from an adequate cause, but neither justified nor excused by the law; as where, upon a sudden quarrel, two persons fight and one kills the other. Here there is no malice, either express or implied, no premeditated design to kill, and the offense is manslaughter and not murder. In order to extenuate the homicide to manslaughter, the provocation must arise at the time of the commission of the offense, and the passion under which the act is committed must be the result of that provocation, and not of a former provocation; for, if the provocation shall have arisen before the commission of the offense sufficiently for reflection, or if the passion under which the act is committed be the result of a former provocation, malice would exist, a formed design to take life would be shown, and the offense would be murder. In manslaughter there is no malice. The passion must arise immediately upon the provocation, and the homicide must follow during the prevalence of the passion, which renders the mind incapable of cool reflection. If the jury have a reasonable doubt of the guilt of

the defendant, they should acquit. The doubt must arise from the evidence, or from the want of evidence. It must be a reasonable doubt, not hypothetical or capricious, but the jury must honestly and conscientiously, under their oaths, and under the law and the evidence given them, doubt the defendant's guilt.

"If the jury find the defendant guilty of murder in the first degree, they will say so and no more; if of the second degree, they will say so, and fix the punishment at confinement in the penitentiary not less than five years. If the jury find the defendant guilty of manslaughter, they will say so, and fix the punishment at not less than two years nor more than five years in the penitentiary. If the jury find the defendant not guilty, they will say so.

"The jury are further charged, that every person is presumed to be innocent until the contrary is proved, but when the killing is proved, the law then implies malice, and it devolves on the defendant to show any extenuating circumstances. If he fail to show such, the presumption of malice remains against him."

The defendant's counsel asked certain charges, which were refused by the court, and which are sufficiently noticed in the opinion.

*Herring & Anderson*, for appellant.—Article 594 of the Penal Code reads: "Manslaughter is voluntary homicide, committed under the immediate influence of sudden passion, arising from an adequate cause, but neither justified nor excused by law." A number of instances are then given of what is termed adequate causes. While these are enumerated, we submit that others, which would have been adequate causes at common law, are not excluded, and that whatever would have reduced the homicide to manslaughter at common law would do so under the provisions of the Code. The testimony shows that the killing in this case was the immediate result of sudden

passion, arising from deceased whipping the child of defendant.

Incapacity of cool reflection, and such as deprives it of the power to weigh well the nature and consequences of the act about to be committed, as stated in the charge, in defining murder of the second degree, is the very essence and main ground of manslaughter; and the jury, from the charge, could not possibly discriminate between murder in the second degree and manslaughter, for, in defining manslaughter, the court says: "In manslaughter there is no malice; the passion must arise immediately upon the provocation, and the homicide must follow during the prevalence of the passion, which renders the mind incapable of cool reflection." The charge becomes essentially material in this cause. For if the jury believed the deceased died of the blow, the only question that could be presented was, whether it was murder in the second degree or manslaughter, and as the charge makes no distinction, or at least none perceivable by a jury, it certainly was highly erroneous.

*William M. Walton, Attorney General,* for the State.—It is assigned for error, that the court erred in the charge to the jury.

In the case of The State v. Atkinson, 20 Tex., 522, the whole question is reviewed, and the charge of the court in this case meets and fully conforms to the rules laid down in the case referred to. (See particularly page 531, and the decisions referred to as had in other States.) The court is fully sustained in its definition of murder in the second degree. The charge touching manslaughter was altogether in favor of the accused, because, under the strict rule, no question of manslaughter arose, no element of manslaughter mingled in the crime. Under the law the crime was murder, either in the first or second degree. The charge relating to manslaughter might have been left

out with great propriety; but, as it is favorable to the defense, there is no cause of complaint. See the words of the defendant as she dealt the mortal blow. It cannot be pretended even that there was adequate cause for the blow.

Donley, J.—It is believed that the charge of the court was calculated to mislead the jury, in not properly defining the distinction between murder in the second decree and manslaughter, and the charge upon manslaughter did not have sufficient reference to the cause before the jury.

The jury were charged, that "in murder in the second decree, the design to kill is conceived and executed in a transport of passion, which renders the mind incapable of cool reflection, and deprives it of the power to weigh well the nature and consequences of the act about to be committed." This charge, under a certain state of facts, might not be objectionable, if there had been no sufficient legal provocation to induce the state of mind supposed in the charge. The actual existence of such a state of mind would not have reduced the killing to manslaughter, although it may have reduced the offense from murder in the first to murder in the second degree, by withdrawing from the case the deliberate design necessary to constitute express malice. To reduce the killing from murder to manslaughter, two things must concur: there must have been provocation legally sufficient to produce passion; and such passion must in fact have been produced, which rendered the party, while under its influence, incapable of cool reflection, depriving her for a time of the power to comprehend the consequences of the act she was about committing.

If the jury, from the evidence, believed that the whipping of the child of the accused by the deceased did in fact produce such sudden anger in the accused as to deprive her of the power for a time to comprehend the effect of

the act she was about committing, and if in fact she had not reflected upon the matter, and had not previously formed a design against the life of the deceased, and had not before contemplated doing her an injury, but being excited and suddenly enraged, so as to deprive her of cool reflection, by the whipping of her child by the deceased, and, while so enraged as to be unable to reflect and weigh the consequences of the act she was about to commit, she struck the deceased, inflicting the mortal wound, she was not guilty of murder, but of manslaughter. And the court should have instructed the jury that the whipping of the child of the accused by the deceased was a sufficient legal provocation to reduce the offense from murder to manslaughter, if in fact, in consequence of the whipping of her child by the deceased, the accused was suddenly so enraged as to be incapable of cool reflection, and she struck, inflicting the mortal wound of which the deceased died, while so enraged; and if the jury believed that the act of the accused was to be attributed to the sudden passion under which she was laboring, and not in pursuance of a preconceived design of the accused, in thus striking and inflicting a mortal wound of which the deceased died, the accused would only be guilty of manslaughter.

The charge, it is believed, did not properly submit to the jury to ascertain from the evidence whether in fact the accused was guilty of murder or manslaughter. The statute makes it the duty of the judge to deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case. This charge is required to be given in all cases, whether asked or not. (O. & W. Dig., Art. 594; Villareal v. The State, decided at Austin, January, 1862;) [26 Tex., 107.]

The court in this charge gave no aid to the jury in determining what facts might be necessary to constitute such legal provocation and passion as might be held to render the accused incapable of acting with deliberation, and

coolly reflecting upon, forming, and executing a design. The charge did not have sufficient reference to the cause before the jury.

By article 594 of O. & W's Digest, it is to be seen that it is the duty of the court, in his charge to the jury, distinctly to set forth the law applicable to the case. The 3d charge asked by the defendant, to the effect, "that if the jury believe that defendant did the stabbing under the influence of sudden passion, arising from the deceased beating her child, she would be guilty only of manslaughter," was properly refused. It did not define the extent and effect of the passion which might reduce the offense from murder to manslaughter. If it were admitted that the passion was induced by a sufficient legal provocation, yet this charge, if given as asked, would have authorized the jury in finding the defendant guilty of manslaughter, although in fact the accused was not so moved by the passion caused by the deceased whipping her child as to deprive her of the power of coolly forming a design and comprehending the effect of the act she was about committing. We have said that provocation alone was not sufficient; that there must be combined with the provocation such passion as for the time renders the party incapable of cool and deliberate reflection.

The judgment is reversed, and the cause

REMANDED.