## DENNIS JOHNSON *v.* THE STATE.

1. EVIDENCE. — It is the province of the jury to reconcile conflicts of evidence, when possible; and, when not, to give credence to the witnesses who appear to them to be most entitled to it.

2. MURDER — CHARGE OF THE COURT — CASE STATED. — In a prosecution for murder, the court charged the jury minutely as to the different grades of homicide, embracing the law of murder of the first and second degrees,

of manslaughter, together with the law of self-defence, malice, express and implied, the legal presumption of innocence, the reasonable doubt as to the general question of guilt or innocence, and as between the different degrees of homicide involved in the trial. *Held*, correct, in view of the facts in the case. See the opinion *in extenso* for charge on murder in the second degree held sufficient under the testimony.

3. Practice. — While the jury are the exclusive judges of the facts in every criminal case, they are not the judges of the law in any case, but must receive it from the court, and be governed thereby.

4. Verdict. — If the verdict of the jury assesses a punishment within the limits prescribed by the statute, this court has no power to interfere upon the ground that it is excessive.

Appeal from the District Court of Houston. Tried below before the Hon. R. S. Walker.

The appellant was indicted for the murder of Edward H. Butler, in Houston County, on December 27, 1877. The conviction was for murder in the second degree, and the punishment was assessed at twenty-seven years' confinement in the State penitentiary.

Dr. Lewis Merriwether, for the State, testified that he was a practising physician. First saw the deceased about five minutes after the stabbing. Witness testified that deceased came to his death by reason of a mortal wound inflicted upon the left side by a sharp cutting instrument, which penetrated to the cavity. Such wound could have been inflicted by the knife exhibited, and which, it is claimed, was used in inflicting the wound. Witness saw two other wounds, inflicted upon the body of deceased by some sharp cutting instrument, but neither of which would have produced death. One was on the left arm, between the wrist and the elbow, and appeared to be a cut across the bone; the other was in the back, and penetrated to the shoulder-blade. Deceased was standing on his feet when witness first saw him, five minutes after the stabbing.

John Penick, for the State, testified that he was present at the difficulty between the appellant and the deceased,

which occurred in Houston County, Texas, on December 26, 1877. Deceased and appellant were in a ten-pin alley, betting on the rolling. The appellant put up a dollar, and the deceased put up seventy-five cents. Appellant thought that deceased had put up a dollar. Appellant won, but only got the seventy-five cents deceased had put up. They had some words about it. At dusk, about one and a-half hours after this, witness, his brother (Jake Penick), J. M. Selkirk, Alex. Hall, and the deceased were in the grocery, when the appellant came in and stood up against the bar. Presently appellant accused some one of stealing a dollar from him. Jake Penick stepped up in front of appellant and asked him if he accused him (Jake Penick) of stealing the dollar. Appellant answered, "No;" whereupon Penick walked off, and deceased stepped up and propounded the same question. Appellant answered, "Yes, you are the man;" whereupon deceased struck appellant a blow upon the lip, with two fingers. Appellant waited until deceased started off, and then plunged his knife in deceased's side. Appellant struck the deceased another blow on the arm, between the wrist and the elbow, and pushed him back on some barrels. Witness and his brother then pulled the appellant off from deceased, and deceased ran out of the house. Appellant also ran out of the house, and struck deceased two more blows, — one on the back, and one on the under side of the arm, next to the body, — making four cuts on the body. Deceased died next morning about daylight.

On cross-examination, witness says that he remained in the house, did not go out at all, and did not see appellant strike deceased outside of the house; and that appellant and deceased, while outside, were out of the sight of witness. About the time deceased came back in the house, witness heard Tom Cook ask appellant not to go back into the house. Witness does not know that defendant came back into the house after his coat and hat. The coat was not in the house,

but was, the witness thinks, on the lumber-pile outside. Witness did not notice particularly what occurred in the ten-pin alley, but thinks the appellant won, and in taking the money down, dropped some of it; some of the money dropped, perhaps falling through the floor. When gathered up, appellant said he did not get all the money he was entitled to, when deceased said, "Here, I will give you two bits." Witness says that appellant did not get the money he thought he was entitled to, as he put up a dollar and deceased only put up four bits. Witness did not take a seat with Tom Cook on the lumber-pile, and say to Cook, when he (Cook) was suggesting or advising appellant to leave the house, to "let defendant alone,— let him have his course." Appellant, when the affair in the ten-pin alley took place, went off without trying to create a disturbance. Witness identified the knife exhibited to Dr. Merriwether, and now, as the knife with which the cutting was done.

Jake Penick, testifying for the State, corroborates his brother, the last witness, as to the occurrences in the ten-pin alley, and says that it did not amount to a difficulty. Witness, his brother John, and deceased, were neighbors and friends. Witness says that himself, deceased, and others were in the grocery, about dusk, when appellant came in and said some one had a dollar of his. Witness then asked appellant if he accused him (witness) of stealing his dollar. Appellant answered, "No;" when deceased asked the same question, and was answered by appellant that he (appellant) did not get all the money he ought to have got. The next witness saw, was the appellant forcing deceased back, and witness and his brother, John Penick, pulled him off. Did not see the wounds inflicted, but saw a knife in appellant's hand. Witness helped to dress the wounds of deceased,— four in number. Death ensued next morning.

On cross-examination, the witness says that he was the only one rolling at the time the bet was made by appellant

and deceased, which was a side-bet, and that he took offence at appellant for saying he had not got all his money, because he (witness) took it as an insult to himself, as he was the only one rolling.    Witness does not recollect that when he approached appellant, as stated, he said to appellant that he would " skin him," or " skin his G—d d—d face," or such expressions, and shook his fist in appellant's face; though he thinks it probable.    Witness remembers that after he had accosted the appellant, as described, he walked back to deceased, but does not remember having words with him. Deceased then advanced on appellant, and commenced talking to him.    Witness did not notice further until he saw them engaged.    Does not know that deceased struck appellant in the face.    Both witness and his brother John were cut by appellant in the fight.    Witness did not, after cursing appellant and talking to deceased, pass a pair of brass knucks to deceased, nor any other weapon.    Did not have any brass knucks; did not see deceased with any, nor did he see or know of any about there.

.   Job Hollingsworth testified, for the State, that on the evening of the killing, about a half-hour before sundown, appellant came to his store and asked to purchase a knife, saying he wanted a good one.    He made a selection, and purchased the one now shown to witness, and identified as the one with which the cutting was done.

On cross-examination, said there was nothing in the deportment of appellant noticeable or unusual.    He merely said, as is frequently said by persons purchasing pocket-knives, that he wanted a good knife.    Witness now says that this occurred about an hour before the difficulty.    Nothing occurred, at the time, to arrest his attention and fix the time; did not examine the timepiece, notice the time of day, nor think of it in that connection until after the difficulty.    Knows it was getting late in the evening; people were not so numerous as during other hours of the day, and

very few were about the store.   Saw nothing in appellant's manner to attract attention; he merely bought the knife and left.

J. M. Selkirk, for the State, testified that he was present when the difficulty occurred.   Himself, John and Jake Penick, Tom Cook, Alex. Hall, and the deceased were in Cook's grocery.   Appellant came in, and said some one had a dollar of his; whereupon Jake Penick asked him if he meant to say that he (Penick) had it, to which appellant responded, " No.'   Deceased then asked the same question, when appellant answered, " Yes."   Deceased then said something to appellant, and was pushed back by appellant, appellant at the same time striking deceased several blows.   The two Penicks then pulled appellant off, but did not see either strike the appellant

On cross-examination, witness. says he is the brother-in-law of the Penicks, and that Jake Penick used strong language, and shook his fist in appellant's face, when he asked if he was accused of stealing the money.   When appellant told Penick that he did not accuse him, Penick walked to or near deceased, and then deceased approached appellant and asked, " Do you accuse me of stealing your money?" Appellant answered that he did not get all the money he was entitled to; when deceased cursed the appellant.   Witness could not see deceased's left hand plainly, as appellant. was between them, but did see that it was in motion towards. appellant, while his right hand hung down .by his side. Does not know that deceased's right hand was in his coat pocket, nor does he know that deceased struck appellant in the face.

F. H. Bayne, sheriff of Houston County, testified, for the State, that he arrested appellant the morning after the difficulty, and found on his person the knife spoken of by witnesses.

Cross-examined, he says he does not know the weight of

the several parties, but that they are all athletic young men. Surmises that Jake Penick will weigh 190 or 200 pounds; John Penick, 180 or 190 pounds; deceased, about 160 or 165 pounds, and appellant, 175 or 180 pounds. The blade of the knife referred to was about three inches long and about three-fourths of an inch wide. The State closed.

The defence introduced Hector Smith. He testified that himself and appellant were standing at the counter in Tom Cook's bar-room, when the deceased and John and Jake Penick asked appellant if he was satisfied about his dollar. Appellant replied that he did not get all that he was entitled to. Penick answered that if appellant said anything more to him, he (Penick) would "skin his (appellant's) face, a G—d d—d son of a b—h," and shook his fist in appellant's face. Appellant did nothing, but answered that he did not accuse Mr. Penick of taking his money. Jake Penick said to him that he (appellant) was a "G—d d—d white man's bully, but he could not be the bully when he (Penick) was there." Appellant again said that he did not accuse Mr. Penick of taking his money. Penick then walked back to where deceased was standing. Words passed which witness did not hear, but he saw Penick's right hand move from his coat pocket, and a corresponding motion from the right hand of deceased (as if to give deceased something), but saw nothing pass from Penick to the deceased. Deceased returned his hand to his right-hand coat pocket (blouse coat, with outside pockets), and, advancing on appellant, asked, "Do you accuse me of stealing your money?" Appellant responded that he had not got all that he was entitled to. Appellant was leaning with his back against the counter, with both hands in his pockets, and deceased stood immediately in front of him, gesticulating in appellant's face violently with his left hand, keeping the right hand in his pocket. Then deceased struck appellant a very hard blow in the face with his left hand, at the same time

throwing up his right hand as though to strike. Appellant then rushed towards deceased, when deceased's right hand struck at appellant, falling over his head and shoulder. A scuffle ensued, and the Penicks rushed in and took hold of appellant. Witness saw no knife or weapon, nor did he see appellant strike deceased.

Witness did not vary this statement on cross-examination.

Thomas J. Cook testified, for the defence, that he was present when deceased was killed, and that he was sitting on some barrels, nearer to deceased than any one else. Doesn't know whether the appellant came to the bar-room before or after the deceased and his party. Thinks they all reached the bar-room about the same time. Something was said about a dollar,— some one asking appellant if he was satisfied about the dollar,— but doesn't distinctly remember what was said, or who said it. Jake Penick asked appellant if he (appellant) accused him (Penick) of stealing his dollar; to which the reply was in the negative. Penick then walked back to where deceased was, and some words passed between them, which witness does not distinctly recollect. Deceased then walked towards appellant, and witness about this time remarked to appellant that he had better go out, and let the dollar alone. Witness was sitting within a few feet of where appellant was standing and leaning back against the counter. Hec Smith was leaning against the counter, some ten feet from appellant. Deceased walked up in front of appellant, and asked if he thought that he (deceased) had stolen his money? Appellant announced that he had not got what he was entitled to. Deceased then cursed appellant. His (deceased's) arm was down by his side, and witness does not know that it was in his pocket. After appellant replied as stated, witness saw deceased strike appellant in the face with his left hand. Appellant then closed in on deceased and ran him back. Then the Penicks rushed in, and all four seemed engaged in a scuffle. Appellant then seemed to be

trying to push them back, but witness now knows that he was cutting. All the three spoken of had hold of appellant at this time. Appellant did not push deceased over barrels, but against a case-shelf, and had him bent backwards. Witness was sitting on the barrels, and they were the only ones in the room.

On cross-examination, he says that the Penicks did not strike or attempt to strike appellant, that witness saw. Did not see deceased or either of the Penicks with weapons. Deceased ran out of the house, as did the appellant, as soon as he got out of the scuffle. Presently witness saw deceased circling around a horse-rack out there, and coming in the direction of the bar-room. Saw appellant coming in the same direction,— both coming pretty fast, with deceased somewhat ahead. Witness told appellant not to come in, and he stopped. Helped undress deceased, and found no weapons on him.

Reëxamined, for the defence, witness says that he did not see appellant strike deceased outside of the house. Noticed that appellant had on no hat or coat. His hat was in the saloon, and one coat he had left in the ten-pin alley adjoining and behind the saloon. Witness thinks he had another coat on the gallery outside the grocery, and by the door. Witness thinks, when appellant replied to Penick's question, as stated, that Penick swore and cursed at him, and shook his fist in his face. Does not know or remember distinctly what was said, but thinks he heard something about " skinning his face."

The instructions given to the jury, on which the errors are assigned, are fully disclosed in the able argument of the appellant's counsel.

*Nunn & Williams*, for the appellant. 1. We submit that the court erred in instructing the jury that "when a man kills another, under circumstances showing a want

of such provocation, justification, or excuse as the law recognizes as a justification, or such provocation as reduces the offence to manslaughter, such an act develops the existence and possession, by the slayer, of a heart regardless of social duty, and fatally bent upon mischief, and this state of mind is called malice." The effect of this instruction is, that from every killing, except such as the law would denominate manslaughter or justifiable homicide, malice would be imputed to the slayer. In other words, every homicide either is manslaughter or murder, or is justifiable. If this be true, what becomes of that grade of culpable homicide known in our law as negligent homicide?

2. The court charged the jury that, "though a homicide may take place under circumstances showing no deliberation, and seemingly in hot blood, induced by passion, and calculated to render the mind incapable of cool reflection, yet, nevertheless, if the slayer provoked and sought a contest with the apparent intention of killing the deceased, or with some dangerous weapon to inflict on him serious bodily harm that might result in death, the offence could not come within the meaning and definition of manslaughter."

The statute (Pasc. Dig., art. 2260) provides: "Though a homicide may take place under circumstances showing no deliberation, yet, if a person guilty thereof provoked a contest with the apparent intention of killing or doing serious bodily injury to deceased, the offence does not come within the definition of manslaughter." While this portion of the charge was mainly copied from this statute, and was doubtless intended to embody the principle of law contained in the latter, still, we submit, this instruction did not give the accused the benefit of such a full exposition of the law on this subject as seemed to be demanded by the peculiar facts of this case, which rendered a proper understanding by the jury, of the distinctions between murder and man-

slaughter, of such vital importance to him. The statute uses the term "apparent," doubtless, in the sense which it is sometimes employed to express *manifest, beyond doubt, obvious.* But the more popular meaning of the word signifies *that which seems to exist,* or is *indicated by appearances,* rather than that which is real or actual.

Now, while the statute uses this word in the former and *quasi*-technical sense, the court followed the very language without conveying to the jury the idea which it was intended to represent. Unquestionably, this provision of the Code is intended to direct inquiry to the real intention, the actual state of mind of the accused at the time of the commission of the act; to ascertain whether, in fact, he acted upon the impulse of sudden passion, or deliberately and in pursuance of a preconceived design. The adjective *apparent* is used only in order to indicate that the intention referred to must be *manifest* and *beyond doubt.* This is the meaning of the statute, which is addressed to the minds of judges of law, provided for the purpose of interpreting it. The charge of the court is addressed to unlearned jurors, who necessarily receive language addressed to them in that sense in which they are accustomed to hear it used.

Therefore, while the statute might well use a term in a special or *quasi*-technical sense, a judge, in giving that statute in charge to a jury, ought to warn them of the special import of the terms employed, to guard against their attaching to such terms their more common and popular meaning. Thus, the jury might well have understood the term "apparent intention," used in this instruction, to refer to what *appeared*, from the circumstances at the time of the killing, to be the intention of the accused, rather than to what, as they were satisfied *on the trial,* was *really* his intention. They might have concluded that the *appearances at the time of the killing* indicated the existence of an intention to kill or do serious bodily harm, and upon

this have found accused guilty of murder, when they were satisfied upon the trial that no such intention in fact existed. We submit that this instruction, in this particular, is of too doubtful and ambiguous a meaning upon so delicate a question, and one so vital to accused as this. We insist that, when the court adopted the language of this section of the Code, it was as much incumbent on him to explain to the jury the sense in which the words "apparent intention" were used, as to instruct them as to the technical signification of such terms as "malice," "the immediate influence of sudden passion," "adequate provocation," and the like.

But the court went beyond the provision of the statute, and charged the jury, in substance, that though the act of accused might *seem* to have been done in hot blood, induced by provocation calculated to render his mind incapable of cool reflection, yet if he sought and provoked the difficulty with the apparent intention, etc., his crime would not be manslaughter. To whom should it *seem* that the killing was done in hot blood, induced by passion calculated to render the mind incapable of cool reflection? To the jury, of course. Now, if all this *seemed* to them to be true, in connection with the hypothesis that the killing was done under circumstances showing no deliberation, which the judge had just before supposed, did it not, as a necessary consequence, *seem* to them that the killing was manslaughter? If so, what right had the judge to tell them to disregard this impression, however faint, and to look for an "*apparent* intention?" We think this is a fair interpretation of this charge, and that it is objectionable as a charge upon the weight of evidence, and therefore erroneous.

3. We submit that the verdict in this case is contrary to the evidence, in this: that it convicted the accused of a higher grade of offence than the evidence warrants. No malice was proven. The attempt to show an antecedent

difficulty in the occurrence in the ten-pin alley, and the evidence in regard to the purchase of the pocket-knife, fall far short of showing any preconceived design against Butler's life. Besides, if these circumstances proved anything, they proved *express* malice.

The jury found against the existence of express malice, and hence must have believed that the occurrence in the ten-pin alley, and the purchase of the knife, had no relation to the killing. Therefore, the question which this verdict presents is: Do the circumstances immediately surrounding the killing show, with judicial precision, that the accused acted upon the promptings of "a wicked, depraved, and malignant spirit, a heart regardless of social duty, and fatally bent upon mischief;" or do they show that he acted upon provocation adequate to produce such a degree of passion as would impel him, in the fury of his mind, to strike down his assailant? We think the evidence clearly shows he acted upon the impulse of sudden passion, produced by an adequate cause.

Three men, all equal to himself in physical power, who were associated together, had made hostile demonstrations towards him. He had been repeatedly insulted by Jacob Penick, who was more immediately associated and acting with deceased. Both words and gestures of a most insulting nature had been used towards him. These were immediately followed up by the use of similar insulting words and threatening gestures by the deceased, which finally culminated in an assault upon his person. All this before he had raised his hand or uttered a threat. Was not this provocation sufficient to require the court to instruct the jury that it was adequate, if the accused acted upon passion suddenly engendered by it?

Here we again invite attention to the charge: "Among the instances of causes deemed to be adequate is an assault and battery by the deceased, inflicted upon the slayer, causing pain." While we admit that no words, nor

an assault and battery of a trifling nature, not causing pain or bloodshed, would by themselves be "adequate causes," yet both combined might. Mr. Bishop, after stating the rule that words can never form an adequate cause, proceeds to say: "The books mention two qualifications of it, namely, *that words added to an assault may perhaps suffice, when the assault would not alone.*" 2 Bishop's Cr. Law, sec. 704, and authorities cited. This is not changed by our statute, which does not undertake to enumerate *every cause* which shall be deemed adequate; and while providing that neither words nor gestures, nor an assault and battery so slight as not to show an intention to inflict pain or injury, shall be considered as adequate causes, does not forbid the idea that both insulting words and gestures and an assault combined might form such adequate cause. Therefore, we think, the court should have given this rule in charge as peculiarly applicable to the facts of this case. *Maria* v. *The State*, 28 Texas, 698.

*W. B. Dunham*, Assistant Attorney-General, for the State.

WINKLER, J. The appellant was indicted for the murder of Edward H. Butler. The indictment charges that the wounds of which the deceased died were inflicted by the appellant, in Houston County, on December 27, 1877, under which the deceased, it is averred, languished for one day, and from which he died December 28, 1877.

On the trial, the jury, by their verdict, acquitted the accused of murder in the first degree, and found him guilty of murder in the second degree, and assessed his punishment at confinement in the State penitentiary for the period of twenty-seven years.

A motion for a new trial was made, which was by the court overruled, and an appeal is prosecuted.

The assignment of errors and the motion for a new trial involve two general questions:

1. Was the testimony adduced on the trial below sufficient to support the finding of the jury?

2. Was there any error in the charge of the court to the jury, such as would require at the hands of this court a reversal of the judgment?

With reference to the first question, we are constrained to say, after a careful examination of the testimony, as we find it set out in the statement of facts, that this must be answered in the affirmative. There is no controversy as to the fact that the deceased came to his death from blows inflicted by the hand of the accused, by the use of a deadly weapon. It is, however, urged on behalf of the appellant, either that the accused, under the testimony as detailed by the witnesses, was entitled to an acquittal on the ground of self-defence, or that, at most, he ought not to have been convicted of any higher grade of culpable homicide than manslaughter. There is some apparent conflict as to some of the facts of the *rencontre* which resulted in the homicide, between the State's witnesses on the one hand, and those put on the stand by the accused on the other. In such a state of case, it devolved upon the jury to deal with the conflict in the evidence, and if the differences between the two sets of witnesses were irreconcilable, and the jury, in order to arrive at a verdict, were compelled to give credence to one set of witnesses to the exclusion of the statements of the other set, or the witnesses offered by the adverse party, they did not, in so doing, transcend the bounds of their duty as defined by law, and this court would not be warranted in setting aside the verdict on that account, the testimony being otherwise sufficient.

As to the charge of the court, we propose to notice briefly, so far as may be deemed necessary, those portions which were complained of as erroneous in the assignment of errors, and discussed in the brief and oral arguments of the appellant's counsel. Before doing so, however, it may not be

amiss to note generally that the judge, in his charge to the jury, instructed them minutely as to the different grades of homicide which they would consider in applying the evidence, and in coming to a conclusion as to what their verdict should be, embracing in these instructions the law of murder, and the distinction between murder of the first degree and murder of the second degree, and the law of manslaughter, and the difference between that offence and murder, together with the law of self-defence, as well as a definition of malice, and the two kinds of malice, viz., express malice and implied malice, and the legal presumption of innocence, and reasonable doubt as to the general question of the guilt or innocence of the accused, as well as between the different degrees of homicide involved in the trial.

The charge, as a whole, appears to have been prepared strictly with reference to the different aspects of the case as developed by the testimony, and with scrupulous regard for all the legal rights of the accused, and a proper appreciation of the momentous issues involved. And, furthermore, the jury were properly instructed as to their powers in determining as to the credibility of the witnesses and the weight and credit to be given to their testimony. It may not be amiss to notice, further, that no exception was taken, at the time of delivery, to the charge, or to any portion thereof, and that no additional instructions were asked by either party, nor were any explanations or modifications asked by counsel representing either side of the case; and in the motion for a new trial, even, no special objection is made to the charge of the court as given to the jury.

Notwithstanding all this, the earnestness and zeal manifested by counsel for the appellant, particularly in the oral argument before the court, would seem to demand at our hands some specific attention to those portions of the charge specifically complained of in the assignment of errors. It is stated in the third error assigned, that "it is believed

the court erred in the charge to the jury in defining murder, in this : that it defines implied malice to arise in every act of killing, when the facts do not reduce it to manslaughter or make it excusable, and it is expressly charged, as matter of law, that such killing develops the existence and possession of a heart regardless of social duty and fatally bent on mischief. It is believed that this charge was calculated to impress the jury that such killing, as matter of law, was murder in the second degree, when it is believed the jury should have been left to decide both as to the manner of killing and as to its effect, with respect to the grade of the offence, if any, of which the defendant was guilty ; '' and, fourth, "the definition of implied malice is not plainly, clearly, and correctly set forth.''

The charge thus complained of as erroneous is found in the general charge of the court, in the following language, to wit: " The kind of malice known as implied malice is such state of the slayer's mind as is implied from the circumstances attending a homicide voluntarily committed, with a deadly weapon, without excuse, justification, or such mitigating circumstances as would reduce the offence to manslaughter, and negative the existence of a wanton, cruel mind, disregarding the safety of his fellow-men or their lives, — a heart regardless of social duty and fatally bent on mischief. When a man kills another, under circumstances indicating that the act was the result of a sudden, rash conception and impulse of the mind, and not from a cool, deliberate mind and formed design to kill or do serious bodily harm, such killing would be murder in the second degree, unless other facts in the case would justify the act, as in self-defence, or reduce it to the crime of manslaughter.''

We are of opinion the criticism upon this portion of the charge is fully met, and the argument answered, by setting forth the charge as it was given to the jury. Especially is

this so when the charge complained of is considered with reference to the preceding and succeeding portions : the former defining murder generally, and murder of the first degree, and the meaning of the term "express malice;" the latter giving the law as to manslaughter — of which hereafter — and the law as to self-defence.

" All murder committed by poison, starving, torture, or express malice is murder in the first degree, and all murder not of the first degree is murder of the second degree." Penal Code, art. 608 (Pasc. Dig., art 2267, and note).

" Murder is distinguishable from every other species of homicide by the absence of the circumstances which reduce the offence to negligent homicide or manslaughter, or which excuse or justify the homicide." See preceding articles of the Code.

The charge complained of is in full accord with the statute law, and adjudications thereunder, and was not an improper or erroneous instruction under the facts of the case.

But it is insisted that the court erred in not submitting the whole question to the jury, instead of charging them that a killing under the circumstances would be, in law, murder of the second degree. This argument is answered by the plain provisions of the Code of Criminal Procedure, art. 573 : " The jury are the exclusive judges of the facts in every criminal cause, but not of the law in any case. They are bound to receive the law from the court, and be governed thereby." Pasc. Dig., art. 3058.

The charge of the court in defining manslaughter, whilst the charge was especially applicable to that grade, was not rendered erroneous and improper by the addition of the following restrictive clause, to wit: " Yet, nevertheless, if the slayer provoked and sought a conflict, with the apparent intention of killing the deceased, or with some dangerous weapon to inflict on him serious bodily harm that

might result in death, the offence would not come within
the meaning and definition of manslaughter; and unless.
the slayer would be justified under the law of self-defence,
the homicide would amount to murder, and whether the
murder would be of the first or of the second degree would
depend upon the distinction between these offences which I
have heretofore given you.''

In this we find no error, when we consider the full and
explicit charge on the subject of manslaughter, and the facts.
proved on the trial.

Counsel cite the case of *Maria* v. *The State*, 28 Texas,
698, in support of the argument on this branch of the case
at bar. Whilst the correctness of the ruling in that case is
not questioned, it will be seen that it was in some respects
exceptional; and it is clearly distinguishable from the pres-
ent case, and the rulings do not apply with any perceivable
force.

It is urged, in argument, that the punishment imposed is.
excessive. With this we have nothing to do. The punish-
ment is within the limit prescribed by the statute law of the
land, and if the law prescribes inadequate punishment for
this or any other offence, the subject addresses itself to the
legislative and not the judicial branch of the government.

Upon the whole, we are of opinion that the charge of the
court, in every particular, was in accordance with the law,.
and applicable to the pleadings and the evidence; and, find-
ing no substantial error in the proceedings, the judgment is.
affirmed.

*Affirmed.*