Syllabus.

## [No. 1355.]

## DOUG. EVANS *v.* THE STATE.

1. MURDER—PRACTICE—EVIDENCE.—The admission in evidence of proof of facts which can have no appreciable value in determining the issue involved, is, if error, immaterial, and not such as will authorize the reversal of the judgment. But see the opinion *in extenso*, for evidence which, considered in connection with other facts in proof, was material and competent, and therefore properly admitted,

2. SAME—STATUTE CONSTRUED.—Article 267 of the Code of Criminal Procedure, prescribing that a magistrate presiding over an examining trial shall certify all of the testimony taken before him and reduced to writing on such trial, cannot be construed to require a separate certificate to the testimony of each witness examined; but a general certificate, covering all of the testimony, will suffice. See the opinion for such a certificate held to meet the full requirements of the law.

3. SAME—CHARGE OF THE COURT—MANSLAUGHTER.—The charge of the court is always sufficient if it distinctly sets forth the law applicable to the evidence; and it is only necessary to give such instructions as are applicable to every legitimate deduction to be drawn from the facts in proof. See a state of case wherein the evidence did not call for a charge upon the subject of manslaughter.

4. SAME.—See statement of this case for charge of the court held correct on the topics discussed.

5. SAME—PRACTICE.—When there is nothing in the record to disclose whether a requested charge was given or refused, the presumption obtains that it was given. It is not error to refuse a requested instruction when it appears that it was substantially embraced in the general charge as given to the jury.

6. SAME.—It is within the discretion of the trial court to refuse an erroneous requested charge, or to so modify it as to make it correct and then give it.

7. SURPRISE—NEW TRIAL—CASE STATED.—It was complained that the defendant was surprised on the trial by the testimony of the State's witness S., who testified to facts on the trial to which he did not testify before the examining court. But it was not pretended that either the defendant or his counsel had ever conversed with S. in regard to what his testimony would be, or that they used any diligence whatever to inform themselves upon the subject, or that they had been in any way deceived or misled in regard thereto. Nor was it shown that S. had testified falsely on the trial, or that his statements were in contradiction of anything he had testified to before the examining court. *Held*, that such is not a sufficient showing that the testimony was calculated to surprise the defendant, and if so, it does not show that such surprise was not the result of his own neglect; wherefore the court did not err in refusing a new trial on thi account.

O

APPEAL from the District Court of Smith. Tried below before the Hon. J. C. Robertson.

The indictment in this case was a joint one against this appellant, Randal Johnson, George Sharp, Paul Johnson, Wyatt Ross and Ed. Moore, for the murder of Frederick A. Godley, in the city of Tyler, Smith county, Texas, on the sixth day of December, 1871. The appellant being alone upon trial, he was convicted of murder in the first degree, and his punishment was assessed at a life term in the State penitentiary.

The statement of facts, comprehending an interesting though a sanguinary narrative of a tragedy which grew out of prosecutions under the celebrated "ku klux" law of Congress, covers over forty pages of the transcript, but only so much of it is condensed in this report as is essential to a clear understanding of the case.

H. B. Butler was the first witness placed upon the stand by the State. He testified that on the evening of the sixth of December, 1871, after he had returned from a buggy drive, he went into Scott's saloon in the town of Tyler, to get a drink. He there met Captain Godley, the deceased, and asked him to join him at the bar, but the deceased declined, saying that he already had more "on board" than he ought to carry home. Among other gentlemen present were John P. Williams, then sheriff of Wood county, and Mr. Givens, who, the witness believed, was a deputy sheriff or constable. To these two gentlemen, the witness was introduced, and he invited them to drink, which invitation they accepted. From the saloon the witness went with them to the City Hotel, where they were quartered, and after a time the three returned to Scott's saloon. While there the second time, a negro named Ran. Johnson, claiming to be a policeman, came into the saloon, and demanded of Captain Williams the surrender of his arms. Williams replied that he had no arms, but that if he had arms he would be violating no law in bearing them, as he was the sheriff of Wood county. He thereupon asked Johnson if he could read, and Johnson replying that he could, Williams exhibited to him his commission as sheriff of Wood county, signed by E. J. Davis, Governor of Texas. Johnson examined the commission and said that it was all right.

In a few moments Givens and the witness went out of the saloon and separated, Givens going in the direction of the City Hotel, on the northeast corner of the square, and the witness

towards the mercantile house of Davis, Cain & Co., on the west side of the square. Neither had proceeded far when Ran. Johnson and several other negroes ran up to Givens, and Johnson presented his gun at Givens and ordered him to surrender his arms. Givens threw his pistol to the ground in front of him, and one of the negroes picked it up. Johnson ordered some of the negroes to take charge of Givens, and then with the other negroes surrounded the witness, and ordered him to surrender his repeater. The witness replied that he had none, and Johnson took hold of him, searched him, and found a derringer in his hip pocket. Johnson then ordered Jack Coleman and John Dunn, two negroes, to take charge of the witness, which they did, each taking the witness by an arm and starting with him to the jail beyond the northeast corner of the public square. The witness and his custodians were followed by a large crowd, including Captain Williams and a number of negroes.

This party had barely passed the southeast corner of the court yard enclosure when the witness heard Captain Godley exclaim: "For God's sake, don't shoot Captain House; he is not armed." The witness looked back and saw Captain Godley holding the muzzle of Johnson's gun, which Johnson was trying to wrest from him. Not being able to do this, Johnson turned the muzzle towards Godley and fired, and then jerked his gun loose from Godley and shot Captain House, who fell dead at once. The firing immediately became general. Just about the time, or just before Captain Godley cried "don't shoot House," the witness heard some one of Johnson's crowd cry out: "Shoot him, G—d d—n him, shoot him; he is armed."

When the firing commenced, one of the negroes guarding the witness released his hold and ran back into the crowd. At the same time the witness grabbed the other by the lappel of his coat and told him to keep cool, but the negro broke loose, threw down his pistol, and ran off in a southeastwardly direction. The witness picked up the pistol and fired twice at the negroes who were shooting. He could not get the pistol to fire again, so threw it at the crowd and ran off towards the City Hotel. The witness saw Captain Williams and another man he did not know fire twice at the crowd of negroes. Thirty or more shots were fired, a large majority by the negroes. There was a large crowd of negroes standing about the sidewalk in front of Scott's saloon, and they appeared very much excited. The witness remembered seeing the defendant but once that day, and that was

on one of his visits to the saloon before the shooting. Defendant was then standing in a crowd of excited negroes, near and facing the saloon. The witness did not notice that the defendant was excited. He heard him say nothing, nor did he see him make any gestures. The witness saw no arms about defendant, and did not think that he was one of the crowd with Johnson, who took his derringer from him, the witness.

Going from the City Hotel around the north side of the square, after the shooting, the witness found Captain Godley trying to make his way to E. H. Wells & Co's drug store. He was about to sink to the ground when the witness took hold of and supported him to the door of the drug store, which, like all the other business houses in town, was closed. The witness prevailed on some one inside to open, and escorted Captain Godley to a lounge inside and laid him down. When the witness first reached Captain Godley, he said: "They have killed me. Oh! my poor wife and children." After he was laid on the lounge in the drug store, he said that he knew he was going to die, and that Ran. Johnson and his crowd had killed him. The witness left the drug store in a short time, and went to Davis, Cain & Co's store on the west side of the square and procured a shotgun, with which he returned to the square to see if he could find any of the negroes engaged in the shooting. They had dispersed, and not one of them was to be seen. Both of the negro saloons were closed.

The witness knew J. W. Brock, of Wood county, by sight. He was pointed out to the witness on the day of the tragedy, but was not introduced to witness. He was a white man, and, the witness understood, a preacher engaged in preaching to negroes. The witness saw him about three o'clock on the evening of the killing, near what was known as Hunt's corner, on the south side of the square, which was across the street, east of where the two negro saloons were. Brock was then talking to some two or three negroes, none of whom the witness knew, and he did not think that the defendant was of their number. The witness did not hear or know the subject of discussion between them. Williams, Givens and others had been brought to Tyler from Wood county for prosecution before the United States courts, upon a complaint made by Brock, charging them with a violation of the "ku klux" law. They were all nominally under arrest and in the custody of an officer, though the witness saw no officer with them that night. The witness thought they

were allowed to go around the street on parole. House and Godley when killed were partners in the practice of law, and were retained to defend the parties from Wood county before the United States commissioner's court. Captain Godley died some time during the night after he was shot. Captain House was killed outright.

W. C. Scott was the next witness for the State. He testified, that just as he started home to supper on the evening of the killing his attention was attracted by an unusual commotion in the neighborhood of John D. Scott's and the two negro saloons described, the corner one of which was called "El Rancho." He went to Scott's saloon, and just as he went in he heard some one say: "Let 'em come, let 'em come, we've got as many fires as they have;" and he heard another voice say at the same time: "Steady! boys, steady!" This last remark came from a crowd of negroes standing around the two negro saloons, and was repeated several times. The witness went into Scott's saloon and there found his brother John, the proprietor, Jud Baggerly, the bar keeper, Frank Griffin and several others, all of whom appeared quiet. The witness asked John Scott: "What is the excitement?" and John asked, "What excitement?" The witness replied: ".The excitement outside among the freedmen," and John Scott said that he "did not know, but supposed it amounted to nothing." The witness presently stepped outside of the saloon and exchanged a few words with Ned Kelley, and as he stepped back to the saloon, he saw, near and facing the door, Ran. Johnson, the defendant Doug. Evans, George Bullard and several other negroes, all of whom had six shooters in their right hands. As the witness went in at the door of the saloon, Frank Griffin, deputy United States marshal, Mr. Williams, sheriff of Wood county, Mr. Givens of Wood county, and several others walked out of the saloon, across the pavement to the square. When they reached the square, Ran. Johnson and several other negroes ran up to Givens and, drawing their pistols on him, ordered him to deliver his arms. The witness could not see that they got a pistol from him, but some negroes started off with him towards the jail. Just then some one of the crowd of negroes said: "Here is another white man who has got a pistol," and several of them ran to a man who was going towards Davis, Cain & Co.'s store. This man they took in charge, and started on with the party in charge of Givens. Just then some of the crowd of negroes ran towards the southeast corner of the court

house enclosure, towards which the Wood county party had gone, and a considerable party of negroes followed them from around the saloons. In a few minutes some one cried, "Shoot him, G——d d——n, he's armed," and a gun fired, which was the beginning of a general fusilade, which extended from that point back to the negro saloon on the corner, from the gallery of which the last shot was fired. The witness then ran into his brother's saloon, and told his brother John Scott to close up his front doors;. which he did. Henderson Howard, and Ned Kelley, sometimes called Ned McGee, were in the saloon at this time and called on the witness and others to witness that they had nothing to do with the row. Just after the shooting was over, the witness heard Willis Boren, sometimes called Willis Wilson, and sometimes "Squealing Willis," from his manner of talking, say from the crowd in front of the negro saloons: "That's the way to do it boys, that's the way to do it."

Dr. Q. A. Shuford, who was called to attend the deceased, testified as to the nature of the wounds, and stated that those wounds caused the death of Captain Godley. The deceased told the witness that Ran. Johnson and others inflicted his wounds, but the witness could not recollect that he mentioned the defendant as among the number. Three wounds were found on the body, two inflicted by balls evidently larger than an ordinary rifle or pistol ball, and another evidently by an ordinary six shooter ball.

The testimony of John B. Douglas was a narrative of his pursuit of and failure to capture or recognize a party of supposed refugees during the next few days, and was material to no issue involved in the case.

The written testimony of the deceased witness Alf. Tucker, taken before the examining court, and which is the basis of one of the rulings of this court, was then read in evidence. After tracing out his movements in the early part of the evening in company with a companion named Tom Younger, he testified in substance that about one quarter of an hour before sundown he went to Scott's grocery, in front of which he saw the deceased talking to Ran. Johnson and Ed. Moore, and heard him say to Ed. Moore: "I am not afraid of any of you boys hurting me. I have slept among negroes many times. I can now put on my blanket and go among any of you, and am not afraid of you hurting me." Ran. Johnson looked Captain Godley in the face, but made no reply. Ed. Moore said: "That is so; but you

know it was not right for Captain House to go and throw his blinds open and get his pistol." Captain Godley said: "He did not do it."

About this time Mr. Williams, from Wood county, started from the saloon toward Whitmore's office, and called to Godley to go with him, but Godley replied that he would not then go with his wife were she to call him. Captain Godley was the only white man the witness saw in that crowd. The witness passed around the crowd to the sidewalk, where Willis Wilson told him there was going to be a row, and asked why the witness, a policeman, did not have his pistol with him, and he replied that Colonel Hunt had written him directing him to return his commission. At this Willis and Guilford Wilson laughed. From here the witness passed into Hodge's grocery, and heard some one say: "Yonder come the white men back." The witness looked and saw about twelve men marching in military order from the City Hotel to the southeast corner of the court house yard. Some one present said there was going to be a row, and Ran. Johnson said to them: "Keep quiet; I know my business, and if those men have arms I am going to capture them." Ran. Johnson then told George Reed, the defendant Doug. Evans, and Paul Johnson to arm themselves and go with him. Paul Johnson replied that he had no pistol, and Ran. Johnson forthwith unbuckled his own six shooter and gave it to him, reserving his Henry rifle for himself. Paul Johnson took the pistol, and before the witness left he heard Paul Johnson tell some white men to give up their arms. When the witness saw that this demand was not to be attended with shooting, he went to the crowd, and next saw Johnson go up to "Squib" Butler, from whom he got a derringer. Ran. Johnson then searched another man, and finding no arms released him. Ran. then ordered Butler taken to jail, and he was started towards jail with Ran. Johnson, the defendant Doug. Evans, Jack Coleman, John Dunn, Paul Johnson and George Reed in charge. The witness followed until he got opposite Patterson's store, where he turned off. At this point he heard Ran. Johnson say: "Captain, I want those arms," but the witness could not say whether he addressed Captain House or Captain Godley, both of whom were standing by. He did not hear what was said in reply, but as he looked around he saw that some one had hold of the barrel of Ran. Johnson's gun, at which Johnson was pulling and jerking.

Here some one, whether white or black the witness did not know, said, "shoot," and the firing commenced.

The witness could not tell who shot first or who was first shot at. When Ran. Johnson got his gun loose, he shot at the man who had held his gun, but the witness did not know whether that was House or Godley. The witness saw the following persons shoot on that occasion, viz: Ran. Johnson, George Reed, Doug. Evans, Paul Johnson and Mr. Williams, sheriff of Wood county. Mr. Williams fired the last shot. Williams and Paul Johnson fired at each other several times, after which both ran. The witness thought that others than those mentioned shot during the fight, but he could not name them. There were from eight to fifteen colored men around, and from three to seven white men.

The colored men stood southwest from the post where House fell, and the white men northeast towards the City Hotel. The witness saw no colored men going to the crowd from the negro groceries when the firing commenced, nor did he see or hear any firing from the direction of the negro saloons. He did not see either Tom Younger or Ed. Moore during the shooting.

This witness was subjected to a searching cross-examination, but it resulted in no appreciable variation of his testimony in chief. The witness thought, however, that other shots were fired before Ran. Johnson shot. He did not know whether Ran. Johnson was the first colored man to shoot or not. George Reed shot about the time that Ran. Johnson shot, and the defendant Doug. Evans shot afterwards. Williams was the last man the witness saw shoot, but he might have fired other shots than this last one. Witness saw other white men shoot besides Williams, and took them to be the men who marched from the City Hotel to that point. The witness did not see, and thought that from his position he could have seen, any shooting from the negro groceries.

Between five and ten minutes after the shooting, the witness went to the place where it occurred, and found Captain House lying there struggling and breathing very hard. Mr. Wooten came up and passed between Captain House and the witness, which caused the witness to step back, in doing which his feet struck against a pistol, which he picked up and put in his bosom, and afterwards turned over to Mr. Collins, deputy sheriff. He examined that pistol next morning, and thought it had been shot once the night before. One chamber was empty and five loaded.

This pistol the witness picked up within four feet of Captain House's body. The witness attended to the cleaning up of Captain House's office, but had never seen such a pistol in any drawers or elsewhere in that office. The witness saw that Wyatt Ross had a pistol when Givens was arrested, but he did not see him present it at Givens. He heard Tom Younger say to Ross at that time: "My God! don't shoot that man," and Ross had his pistol at that time. In a subsequent conversation with the witness, Wyatt Ross said to the witness: "Don't you know that you saw Tom Younger shoot, like I did?" The witness answered that he did not, and Ross asked him: "If I prove by Ed. Wooten and Bob Johnson that I saw Younger shoot, won't you believe it?" and the witness replied, "If you prove it, I will believe it." Ross then said: "All right, I will have you and Ed. examined by the court." Ross asked the witness if he would not swear that he saw Tom Younger shoot, and the witness replied that he would not, as he had not seen him shoot.

John D. Scott testified, for the State, in substance, that some little time before the shooting, House, Godley, Williams and others from Wood county were in his saloon, when Ran. Johnson and Ed. Moore came into the saloon and demanded of Williams if he had any arms, to which Williams replied that he had not, but that, as sheriff of Wood county, he was legally authorized to bear arms. Ran. Johnson then asked Captain House if he did not have a derringer. House pulled out a bunch of keys and twirled them on his fingers, and said they were the only arms he had. The parties in the saloon were quiet, except Johnson and Moore, who appeared to be excited. Other negroes came to the door, but the witness could not say that the defendant was among the number. The witness was in his saloon during the shooting, and there were in there with him Jud Baggerly, Ned McGee, Henderson Howard, and perhaps others. The witness did not know whether other business houses in town were closed when the firing commenced or not, but he did not then close his saloon, nor did he do so shortly afterwards.

Judge S. D. Wood, United States commissioner at the time of the killing, testified that a few days before that event one J. M. Brock, of Wood county, made before him a complaint against John P. Williams, and perhaps a dozen others of Wood county, charging them with a violation of the "ku klux" law, alleging that they came to his house and shot him. The witness issued

his warrant and placed it in the hands of deputy marshal Griffin, who produced the Wood county parties about two or three o'clock on the evening of the shooting of House and Godley. Just about the time the men were brought into the witness's office, Brock, who was there, jumped up very suddenly and left hurriedly, going out at a side door.  He seemed to be very much afraid of the Wood county men, and impressed the witness as being a very great coward.  Brock made no threats against the Wood county men in the hearing of the witness.  The defendant was not present on that occasion.

C. L. Striplin, whose testimony was assailed in the motion for new trial as a surprise, testified for the State, in substance, that he was near Scott's saloon when the firing commenced in a considerable crowd out near the southeast corner of the court house yard.  He was near the south steps of the court house when the last shot was fired.  That shot was fired from near the southeast corner of the square, and not from the gallery of the negro saloon east of Scott's.  A few minutes after the shooting, three men, whom the witness saw, ran from the direction of the southeast corner of the court house yard to one of the negro saloons, which they entered.  These men the witness recognized as Ran. Johnson, Paul Johnson and the defendant.

The witness remembered testifying on the examining trial of several parties who were arrested for participation in the killing, but did not recollect whether or not the defendant was one of them, or whether he was present at that trial.  He identified the writing handed him as his testimony before that trial, and which was signed by him.

Bereft of unnecessary detail, the testimony of Bob Lucas, for the defense, was to the effect that he was present when Ran. Johnson summoned the defendant as one of a *posse* to assist in disarming a party of white men.  The defendant refused, as he was unarmed.  Ran. Johnson replied to him "Very well; I shall see that you special police are discharged, for you are never prepared when you are wanted."  The witness likewise refused to assist Johnson.  Johnson left the saloon, and the defendant did not go with him, nor did he go to the place where the shooting occurred.  The witness declared that he was on the gallery of Moore's saloon when the shooting commenced, and that he saw Captain House fire the first shot at Ran. Johnson.  The witness had nothing to do with the affair at all, but was arrested next

morning as a participant, and was kept confined until after the examining trial.　The defendant was also jailed for that offense.

The substance of the testimony of Henderson Howard, for the defense, omitting the details, was that he left Ed. Moore's saloon by the back door, going to Jones's blacksmith shop about one hundred yards south of the square, where he was employed, just before the shooting commenced.　The defendant followed just behind him, out of the same back door, until they got to the blacksmith shop.　The witness resumed his work in the shop immediately, and the firing on the square took place right then. This witness denied that he was in Scott's saloon when the firing took place.　After the witness had gone home and returned that night, after the shooting, he saw the defendant on the street near the negro saloons.

The written testimony of C. L. Striplin, as taken before the examining court, was then read by the defense.　It was not materially different from his testimony on this trial, but contained no statement about his recognition of the defendant as he went into a negro saloon after the shooting.

Ned McGee, sometimes called Ned Kelley, testified in substance that he was present when "Squib" Butler was arrested for carrying arms by Ran. Johnson and others, and (contradicting the statement of State's witness Alf. Tucker) that the defendant was not of that party, nor of that which started with Butler and Givens to jail.　The witness went into Scott's saloon when the shooting commenced, and in there saw John D. Scott, Jud Baggerly, Henderson Howard and some others.

The substance of George Bullard's testimony was that he was not with the defendant at or near Scott's saloon or anywhere else on the evening of the shooting; that he did not see the defendant that evening at all, and that he had no pistol on that evening, and that he owned no pistol.　This was contradictory of State's witness W. C. Scott.

Willis Wilson, *alias* Willis Boren, testified in substance that he and his brother Guilford Wilson were at home and not on the square when the shooting occurred, and did not see Alf. Tucker on that evening, which statement was contradictory of the witness Tucker's statement.　Contradictory of the State's witness W. C. Scott, he testified that he was not on the square just after the shooting was over, and did not say: "That's the way to do it, boys; that's the way to do it."　Guilford Wilson corroborated

his brother Willis, testifying that the two were together at home, three hundred yards distant from the shooting, when it occurred.

The substance of the testimony of the defendant's wife, Mattie, was that the defendant reached home some fifteen or twenty minutes after the shooting, and remained all night. He was arrested next morning, and confined in jail until the examining trial, when he was released on bond. He remained in Tyler for four or five years, and then removed to Marion county, where he went under the name of John Gray, until he was arrested, about a year before this trial.

The defendant then introduced in evidence the former orders of the court showing that after indictment in March, 1872, the defendant was admitted to and gave bail in the sum of one thousand dollars, and that the cause was continued at each term of the court until the March term, 1875, when there was a forfeiture of the recognizance.

In rebuttal the State introduced the further orders of the court showing that the general and usual order of the court thereafter was "alias capias and continued," until the defendant was re-arrested in 1881.

That portion of the charge of the court referred to in the fourth head note, and held correct by this court, is as follows:

" * * * * * * If the testimony does not show that the defendant's was the hand which struck the fatal blow, or fired the fatal shot which took the life of F. A. Godley, and the evidence shows that the same was done by Ran. Johnson, Ed. Wooten or any other person or persons, and you further find that the defendant Douglas Evans was a party thereto, was present acting together with such other parties, then was the said Randal Johnson, Ed. Wooten or Moore, or such others, justified or excused under the law in taking F. A. Godley's life? If they were, the defendant would likewise be justified; and this brings you to the question whether the said Ran. Johnson was justified in the performance of a duty as an officer. First. Does the proof show that the said Ran. Johnson was a policeman? If it does not, you need not inquire further as to justification in performing a duty as an officer. If the proof satisfies your minds that he was a policeman, then the law would authorize him to arrest F. A. Godley, if on his own information, or the knowledge is conveyed to him, that the said F. A. Godley had about his person a pistol or other weapons prohibited by law from being carried; and these facts must appear from the testi-

mony. If Ran. Johnson was such policeman, and knew of his knowledge, or the knowledge is conveyed to him, that the said Godley has such weapons about his person, then in making the arrest, he must make known his purpose and the capacity in which he acts, and then in making such arrest the officer is authorized to use such force against force as may be necessary to overcome resistance to such arrest; but he should not take the life of the person resisting, unless he has grounds to fear that his own life will be taken by the person about to be arrested, or that he will suffer serious or great bodily injury in making the arrest, at the hands of the deceased; and such grounds for the fear of such injuries must have appeared to be imminent or pressing at the time.

"If the said Ran. Johnson was a policeman, and was justified in arresting F. A. Godley under the authority, on the facts, and under the circumstances stated in the foregoing paragraph of this charge, and the defendant was acting with and under his authority as one of a *posse*, he likewise would be justified. But, if the said Ran. Johnson is not proven to be a policeman, or if he undertook to arrest F. A. Godley without his own information, or information conveyed to him, that said Godley had about his person such unlawful weapons, or, in making the arrest, he did not make known his purpose and the capacity in which he was acting, or if his purpose was to make a search for weapons, and to disarm F. A. Godley or R. E. House, or both, he was a trespasser and wrong doer; and if he took the life of F. A. God-ley with malice aforethought, he would be guilty of murder in the first degree or murder in the second degree, as he may have been governed by express or implied malice, as before explained.

"And, if the testimony shows that the defendant Douglas Evans was acting together with the said Randal Johnson, Ed. Wooten, or others, in the commission of said offense, knowing the unlawful purpose, the act of one is the act of all, and he would be a principal in the crime in the same degree with the said Randal Johnson, Ed. Wooten, or others who the proof may show fired the fatal shot.

"If the said Ran. Johnson, or others acting with the said defendant, brought about the necessity to use force to overcome resistance, and thereby created the grounds to believe his own life in danger, and he was not justified, as a policeman, to make the arrest, he and those acting together with him, knowing the unlawful intent, if they took the life of F. A. Godley, would be

guilty of murder if they were moved or instigated by malice, express or implied, and the offense would be murder of the first or second degree, as you may find under the rules laid down before.

"You are further instructed, that neither peace officers nor policemen have ever had authority, under the law, to arrest any citizen to ascertain if he had weapons, and any citizen would be justified in resisting any such arrest and search, even to taking the life of such officer if necessary for successful resistance; and such officer, and those knowing the illegal purpose, acting with him, are offenders, and cannot avail themselves of the rights of officers in the performance of their official duty.

"If there was a crowd gathered, and many or most of them were engaged in an unlawful purpose; if they were seeking to kill and murder either the deceased or other persons, and if the defendant was about there, but in no manner participated in the unlawful purpose or acts of such crowd of persons, and did not engage in aiding, assisting or encouraging others in the unlawful purpose, he would not be guilty, because the criminal intent would be wanting; but it would be otherwise if the proof shows the defendant was present, acting together with, and did aid, assist or encourage, by words or acts, others in the commission of the offense, if such offense was committed; and, in such case, the act of one is the act of all, and each participant would be guilty as a principal."

In addition to the questions ruled upon by this court in this case, the defendant's motion for a new trial assailed the action of the trial court in excusing certain jurors from service or attendance on the court under a special venire, and alleged that the verdict of the jury was contrary to the law and the evidence.

*C. G. White*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

WILLSON, J.   Upon the trial of this case the State was permitted, over the objections of the defendant, to prove certain facts in relation to one J. M. Brock; that is, that said Brock was a white man, and a preacher who preached to the negroes; that, a short time prior to the killing of Godley, he, Brock, had charged certain citizens of Wood county, before a United States commissioner at Tyler, with a violation of the law known as the

ku klux law; that said citizens had been arrested upon this charge and brought to Tyler, and were in Tyler, and near the place where Godley was killed at the time of the killing; that Brock was also in Tyler on that day, and was observed on the streets of Tyler, a short time before Godley was killed, in conversation with a company of three or four negroes. It is strenuously contended by counsel for defendant that the admission of this testimony was error for which the judgment of conviction should be reversed. The objection urged is that the testimony was irrelevant to any issue in the case, and does not in the remotest degree tend to connect the defendant with the alleged murder.

In order to determine the relevancy of this evidence we must consider other facts in evidence. Brock was a white man, and a preacher engaged in preaching to negroes. It is therefore reasonable to suppose that he exercised an influence over that class of our population. He was engaged in the prosecution of some citizens of Wood county, whom he had caused to be arrested and brought from their homes to Tyler, for a trial before a United States commissioner. There was bad feeling between these citizens and Brock. House and Godley, who were lawyers and partners, were the attorneys who had been engaged by the Wood county citizens to defend them in their trial before the commissioner. On the evening that House and Godley were killed there was a large number of negroes assembled in Tyler, upon the public square, on the streets, and in and around two drinking saloons which were kept by negroes. Many of these negroes were armed, and among them was one Randal Johnson, who claimed to be a policeman, and who was armed with a Henry rifle; and he seemed to be a leader among the negroes assembled. Many of these negroes appeared to be in an excited state, and there were remarks and movements among them which indicated a concerted plan, and a preparation on their part, under the leadership of Randal Johnson, to make some kind of an attack upon the Wood county men, and those in company with them. The defendant was seen in this assemblage of excited and armed negroes. What was the cause of this excitement? Why were these negroes assembled and conferring together, armed with guns and pistols, and muttering prophecies of an approaching conflict? There was no apparent cause for these threatening demonstrations. What, then, was the hidden motive propelling these unusual movements? Was it not the

presence upon the streets of Tyler of these Wood county men who were being prosecuted by the preacher Brock, and who were being defended in that prosecution by House and Godley? The evidence to our minds indicates that such was the case. It is claimed that the purpose of Randal Johnson and his followers was merely to disarm these men, and that the knowledge of this purpose among the assembled negroes was the cause of the excitement. Concede this to be the fact, who was the instigator of this purpose on the part of Randal Johnson and his crowd?

Under this state of facts was it not proper for the State to inquire as to the movements and motives of this man Brock? Was it not proper and relevant to show who he was, that he was in Tyler, that he was seen conversing with some of these excited negroes only a short time before the terrible tragedy, and that he, of all other men on that occasion, had a motive for concerting and impelling a conflict in which in all probability he would have accomplished the removal of his hated and feared adversaries? We think the testimony was relevant and proper, when considered in connection with the other evidence in the case, and that the court did not err in admitting it. If, on the other hand, as contended by defendant's counsel, the testimony was wholly irrelevant, foreign to any issue in the case, then it could have no appreciable value in determining the issue involved; would be immaterial, and a refusal to exclude it would not be sufficient cause for a reversal of the judgment. (*Gose* v. *The State*, 6 Texas Ct. App., 121.)

It is also claimed by defendant's counsel that the court erred in admitting the testimony of Alf. Tucker, a witness for the State. This witness was examined on the trial of the defendant, had before an examining court shortly after the murder of Godley, and his testimony was reduced to writing at the time, and was signed by the witness. The proper predicate was laid for the introduction of this testimony by the State, by proving that the witness Alf. Tucker was dead; that the defendant was present before the examining court when the witness was examined, and had the opportunity afforded him of cross-examining said witness. The objection urged against the admissibility of the written testimony of this witness is, that it was not certified by the examining court in the manner required by law. The evidence before the examining court, all of which was reduced to writing, is voluminous, constituting a record of over three hun-

dred pages, and appended to it is the following certificate of the examining court:

"THE STATE OF TEXAS, ⎰
 "COUNTY OF SMITH. ⎱

"I, Z. Norton, Judge of the Ninth Judicial District, sitting as an examining court in a case wherein the State of Texas is plaintiff and Ed. Moore (*alias* Wooten) and others are defendants, said defendants being charged with murder of R. E. House and F. A. Godley, do hereby certify that the foregoing three hundred and sixty-four (364) pages contain the proceedings had before me as an examining court. as aforesaid, as thereon purporting to have been had, containing the evidence and genuine signatures, etc., as appears. All of which is respectfully submitted to the Honorable District Court of said county. Witness the seal of court, and my official signature, January the 23rd, 1872.

  "Z. NORTON, Judge of the Ninth Judicial District."

The law governing this subject is found in Article 267 of the Code of Criminal Procedure, which reads as follows:

"The testimony of each witness shall be reduced to writing by the magistrate, or some one under his direction, and shall then be read over to the witness, or he may read it over himself, and such corrections shall be made in the same as the witness may direct, and he shall then sign the same by affixing thereto his name or mark. All the testimony thus taken shall be certified to by the magistrate taking the same."

We think the certificate before us fully complies with the requirements of the law. It certainly was not contemplated by the lawmakers, as contended for by defendant's counsel, that the testimony of each witness should be separately certified to. Such a construction would be contrary to the plain language of the statute, and unsupported by reason We are clearly of the opinion that the court did not err in admitting the testimony of the witness Alf. Tucker.

A number of objections are presented and insisted upon by defendant's counsel to the charge of the court. It is contended that the court should have charged the law of manslaughter. The charge of the court is always sufficient if it distinctly sets forth the law applicable to the evidence (*Smith* v. *The State,* 8 Texas Ct. App., 141), and it is only necessary to give such instructions as are applicable to every legitimate deduction to be

P

drawn from the facts in proof.    (*Johnson* v. *The State*, 27 Texas, 758; *Maria* v. *The State*, 28 Texas, 698; *Bishop* v. *The State*, 43 Texas, 390; *Rogers* v. *The State*, 1 Texas Ct. App., 187; *Bronson* v. *The State*, 2 Texas Ct. App., 46; *Merritt* v. *The State*, 2 Texas Ct. App., 177; *Hutto* v. *The State*, 7 Texas Ct. App., 44; *Smith* v. *The State*, 7 Texas Ct. App., 414; *Eanes* v. *The State*, 10 Texas Ct. App., 421; *Williams* v. *The State*, 10 Texas Ct. App., 528;) In the case at bar there is no evidence tending to show such a state of facts as would reduce the homicide of Godley from murder to manslaughter.    The homicide was either murder or it was justifiable.    The evidence presents no "adequate cause" for the killing, and unless the killing was in self-defense it was necessarily murder, and the court would have been going beyond the facts of the case if it had instructed the jury in regard to the law of manslaughter.

It is further objected to the charge of the court, that it does not sufficiently present the law of self-defense; that it does not sufficiently present the law governing the defense of *alibi;* that it misdirected the jury as to the rights of a policeman, and those acting under his authority, in making arrests, etc.    Without considering in detail the exceptions made to the charge, suffice it to say that we have examined it carefully and critically, and are of the opinion, taking it as a whole, that it is an able, clear and comprehensive exposition of the law of the case, and in all respects as favorable to the defendant as the facts would warrant.    We have been unable to discover any error, even an immaterial one, in the evidently very carefully prepared charge of the learned judge who presided at the trial.

The defendant also complains that the court erred in refusing to give to the jury special instruction No. 1, asked by him.    It does not appear from the record whether this instruction was given or refused.    There is nothing written upon it by the judge to indicate what disposition was made of it.    In such case, it is presumed, on appeal, that the charge was given to the jury. (*Seal* v. *The State*, 28 Texas, 491; *Johnson* v. *The State*, 7 Texas Ct. App., 210.)    But we are of the opinion that, even if this requested instruction was refused by the court, it was not error, because, we think, it was substantially embraced in the general charge of the court as given to the jury.

Another error assigned by the defendant is, that the court added a qualification to defendant's special charge No. 2 before giving it to the jury.    We think the qualification was proper,

and stated the law correctly, and it was within the discretion of the court to refuse the charge as asked, or to modify and give it. (Code Crim. Proc., Art. 679; *Ramey* v. *The State,* 14 Texas, 409; *Needham* v. *The State,* 19 Texas 332; *McMahon* v. *The State,* 1 Texas Ct. App., 102.)

Among other grounds presented by defendant for a new trial, was that he was surprised on the trial by the testimony of the State's witness Striplin, who testified to facts on the trial which he had not testified to before the examining court. It is not pretended that either the defendant or his counsel had ever conversed with Striplin in regard to what his testimony would be, or that they had used any diligence whatever to inform themselves upon the subject, or that they had been in any way improperly misled or deceived in regard thereto. Neither is it shown that Striplin had testified falsely on the trial, or that his statements were in contradiction of anything he had testified to before the examining court. We are unable to perceive that the testimony of this witness was calculated to surprise the defendant, and if it was, it does not appear but that the surprise was occasioned by his own carelessness and neglect.

We have bestowed upon this important case a most careful consideration, and our deliberate conclusion is that the verdict of the jury is supported by the evidence, and that the defendant has had a fair and impartial trial in strict accordance with the forms of law, and that there is no error in the proceedings which would warrant us in disturbing the judgment of the trial court, and the same is therefore affirmed.

*Affirmed.*

Opinion delivered November 18, 1882.